Larry **STRADLEY**, Plaintiff,

v.

Richard R. **ANDERSEN**, as Chief of the Division of Police, Department of Public Safety, City of Omaha, Nebraska, Defendant.

Civ. No. 71-L-228.

United States District Court,
D. Nebraska.

Oct. 27, 1972.

Bennett G. Hornstein and Stanley A. Krieger, Omaha, Neb., for plaintiff.

James E. Fellows and Kent N. Whinnery, Asst. City Attys., Omaha, Neb., for defendant.

## MEMORANDUM OPINION

DENNEY, District Judge.

This case comes before the Court upon application of the plaintiff for a preliminary and permanent injunction restraining enforcement of order #48–71 promulgated by Chief Richard R. Andersen, of the City of Omaha Police Division. The action is prosecuted as a class action on behalf of the plaintiff and all others similarly situated. Pursuant to order of the 8th Circuit Court of Appeals, 456 F.2d 1063, this Court has conducted a hearing on the merits of plaintiff's application and now renders its opinion.

The Court would take this opportunity to point out that, although it now appears to the Court that at least in this Circuit it is well settled that any person claiming deprivation of any possible civil right need not make an attempt to solve his problem with his immediate superior nor seek relief from his own local courts before he can command this Court to interfere via 42 U.S.C.A. § 1983, the foundation for this rule is legally questionable and has had disastrous effects on the dockets of the district courts.

The rule regarding no exhaustion has its roots in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 [1961]. In *Monroe*, the Supreme Court traced the legislative history of § 1983 and concluded that the intent of Congress was "to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice." [1] Thus § 1983 was enacted with particularly the "lawless conditions existing in the South in 1871" [2] in mind. From this, the Court concluded that the "federal remedy [under § 1983] is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." [3] The Court suggests that a more responsive rule to the legislative history would be that exhaustion is not required where the state remedy, adequate in theory, is not available in practice. This would foster and give incentive to the States to continue to be as zealous in the protection of federal constitutional rights as the federal courts. It is time for the federal judiciary to recognize that Federal Courts are not the sole protectors of constitutional rights and that the dual nature of sovereignty in the United States obligates the federal court to respect their State counterparts. As this Court previously stated, quoting no less than Chief Justice Burger:

"People speak glibly of putting all the problems of pollution, of crowded cities, of consumer class actions and oth-

---

1. Monroe v. Pape, 365 U.S. 167, 174, 81 S.Ct. 473, 477, 5 L.Ed.2d 492 [1961].

2. Id.

3. Id. p. 183, 81 S.Ct. p. 482.

ers in the federal courts. We should look more to state courts familiar with local conditions and local problems." Alberda v. Noell, 322 F.Supp. 1379, 1382 [E.D.Mich.1971], Stradley v. Andersen, 334 F.Supp. 72 [D.Nev. 1971].

The desirability of the rule as to the facts of this case is evident. Chief Andersen testified that the order was issued on May 17, 1971, but that it was not to be effective until June 1, 1971. The Chief stated the interim period was designed to allow any interested officer an opportunity to come in and discuss the regulation if he felt it was not adequate or should be modified. It was Chief Andersen's testimony that he was open to suggestions during the interim period, but no one approached him directly. Instead, just before the regulation was to be effective, he was served with a temporary restraining order issued by this Court. Had the plaintiff attempted to discuss the matter with Chief Andersen, this litigation might well have been avoided. Chief Andersen was the first step in plaintiff's administrative remedies and whether or not plaintiff should have had to exhaust his administrative remedies is not at issue. At least, he should have had to attempt the first step.

The order in question regulates the length of hair permissible for certain male members of the Omaha Police Division.[4] (Appendix A)

The plaintiff does not contend that it is not proper for Chief Andersen to promulgate rules and regulations for the operation of the Police Division nor that grooming cannot be a proper subject of regulation. The plaintiff only attacks the validity of order #48–71.

The threshold inquiry of the Court is whether or not the police officers have any constitutionally protected rights relating to hair style or length that order #48–71 might infringe.

■■ It has become the law in this Circuit, through the vehicle of cases involving schools and students, that each member of the general population possesses a right to choose his or her own style and length of hair and that such choice is protected by the Ninth Amendment of the United States Constitution. Bishop v. Colaw, 450 F.2d 1069 [8th Cir. 1971]. The Supreme Court has had occasion to hold that "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 [1967]. It follows that at least in this Circuit police officers have a constitutional right to choose their individual hair style or length.

■ The Court's inquiry is not, however, finished because personal freedoms are not absolute and must give way when outweighed by legitimate State interests. Bishop v. Colaw, *supra*, 450 F. 2d at p. 1075.

■ Here, the Court is convinced that the order served two legitimate state interests, either of which would be a proper basis for the order.

Chief Andersen testified that the order was in part based upon the need to have uniform standards of grooming throughout the force. This need is not unlike that which causes the division to require a certain style of shirt and hat or that all officers should wear black shoes. The testimony of plaintiff's witnesses did not dispute the need for standard uniforms for officers. Courts such as the United States District Court for the Eastern District of New York have held uniformity of dress, including regulation of grooming, is a legitimate State interest. Dwen v. Barry, 336 F. Supp. 487 [E.D.N.Y.1971]. Chief An-

---

4. It was the testimony of Chief Andersen that, although the order as promulgated was sufficiently broad to encompass the entire Division, it was not intended to apply to any female officers or male undercover officers and had not been enforced against such individuals.

dersen elaborated in his testimony as to the necessity of such uniformity, saying that it is important to the safety of the public that the public be able to recognize police officers immediately. It is apparent to the Court that any hesitation in seeking assistance or cooperating with officers because of the unique position of policemen could mean the difference between life and death. The public should not have to guess who is and who is not a bona fide officer of the law. Uniformity of dress prevents such problems. Grooming standards, as part of uniform regulations, are a legitimate State interest. The desire of the police officer for individuality in the selection of his hair style and length is outweighed by the legitimate State interest in immediate public recognition of bona fide police officers.

It was Chief Andersen's expert opinion, based upon his 21 years of experience as a police officer, that there exists a direct relationship between the personal appearance of a police officer and his ability to effectuate his responsibilities. The Chief stated that, in his opinion, the policeman should project a "neutral" appearance, identifying with neither far-out section of the general public. This will enable the Police Division to obtain a maximum amount of respect from the community it is charged with protecting. The Court is equally convinced that such neutrality is a legitimate State interest. It is beyond argument that if the majority of the public was in open rebellion over the length of policemen's hair it would impair the effectiveness of the individual officer. Although such outrage is not present herein, the Chief did testify that numerous complaints had been received. The Court is of the opinion that from such complaints the Chief could legitimately draw the inference that the effectiveness of some of his officers was not being

maximized because portions of the public did not have the highest respect for the Police Division solely because of the personal appearance of some of its officers.

■ It is the Court's opinion that projecting a "neutral" appearance, because of its relationship to the effectiveness of the police officer and the respect of the public, outweighs the police officer's desire to assert his individuality by identifying with a particular segment of society through his hair length or style.

It remains to the Court to determine whether the regulation is reasonably related to the legitimate State interest sought to be attained. Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 [1970].

■ The testimony of the plaintiff's witnesses revealed that there was a lack of agreement among the dissident police officers as to how the regulation should be properly drawn. The plaintiff himself, in the hearing of June 2, 1971, testified that police officers should be allowed Fu Manchu mustaches, but not goatees. During the hearing of October 2, 1972, witness Archer for the plaintiff testified that he had left the force because of the regulation, but that he did not believe that policemen should be allowed to have shoulder length hair similar to what he now wore. It is evident that, no matter what regulation Chief Andersen was finally able to devise, not everyone could be pleased. Chief Andersen testified that the regulation was not lightly drawn. Over a period of some two months, he and his four deputy chiefs examined similar regulations from other communities. In the end, they considered the average standards of the community in which the officers had to perform their duties and carefully drafted the regulation with an eye to allowing for a certain range of individuality within the Division.[5] The Court has

---

5. It is appropriate that the regulation was based, in part, upon contemporary community standards as to what the public would accept in the personal appearance of their public servants. Community standards have often been used to gauge the limits of constitutional rights. See, e. g., Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 [1957]. What a community in California might accept in its public servants quite properly may not be the same as Nebraska's requires.

examined the regulation at some length and cannot say that on its face nor from the evidence adduced it fails to be calculated to reasonably achieve the legitimate State interests as denominated by the Court. The regulation provides for hair styles and lengths somewhere in the middle range of those that abound today.

■ It is the conclusion of the Court that the defendant has sustained his burden of proving the necessity of order #48–71 of Chief Andersen and that plaintiff's application for injunctive relief should be denied. The regulation is reasonable and calculated to achieve legitimate State interests. An Order in accordance with this opinion will be entered contemporaneously herewith.[6]

APPENDIX A

DEPARTMENT OF PUBLIC SAFETY DIVISION OF POLICE OMAHA NEBRASKA

Date: 17 May 1971
Monday

DIVISION GENERAL ORDER #48–71
RE: STANDARDS OF APPEARANCE FOR POLICE OFFICERS

This order pertains to Chapter I, Section 19, of the Rules and Regulations of the Police Division, "Unprofessional actions, or conduct, while on duty or in uniform."

All personnel shall be alert, efficient, neat and business-like before the public.

Hair appearance has become quite a problem as far as appearance before the public is concerned within the Omaha Police Division.

Numerous comments, complaints, and criticism have been directed toward the Police Division based on outlandish types of hair styles. In order to reasonably conform with the general public,

the following regulations shall be applicable, and shall be effective as of 1 June 1971, for all members of the Omaha Police Division.

HAIR: Hair must be evenly tapered on sides and back. No hair will lap or curl over the ears or shirt collar. Hair style cannot interfere with the normal wearing of the uniform headgear. This means that the hat of the uniform, when properly worn, must be in close proximity to both the ears and the eyebrows of the person wearing the hat in a standard appearing manner.

SIDEBURNS: Maximum length of sideburns will be to the bottom level of the ear lobe. No flair (muttonchops). Sideburns must be evenly tapered, cut parallel to the ground, and can be no wider than one inch.

MUSTACHE: Mustaches must be neatly trimmed and tapered. Mustaches shall not extend beyond the corner of the mouth looking at a person directly to his face. No handlebar or Fu Manchu types of mustaches will be allowed.

GOATEE OR BEARD: Beards and Goatees will not be allowed under any conditions. The face must be clean shaven for working purposes other than as specified above.

Exceptions to these rules shall only be allowed for officers who are working in the undercover type of activity within and for the Omaha Police Division. The special exemptions for this purpose shall be by request and directive of the Deputy Chief in charge of the Criminal Investigations Bureau.

By order of

[s] Richard R. Andersen
RICHARD R. ANDERSEN
Chief of Police
/jp

---

6. Plaintiff has also argued that order #48–71 amounts to impermissible sex discrimination, since it does not apply to female officers. The Court is of the opinion that the reasons herein cited for sustaining the regulation as to the Ninth Amendment apply as well to this contention of plaintiff and that the classification is not arbitrary within the meaning of Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 [1971].